**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

RICHARD WEAN,
Plaintiff,

v. Case No. 2:23-cv-302-SPC-NPM

MELINDA MASTERS, et al.,
Defendants.

---

# ORDER

Before the Court is the Defendants' motion for summary judgment on Plaintiff Richard Wean's claims for deliberate indifference to his serious medical needs. (Doc. 110.) Upon consideration of the motion, (*id*.), Wean's response, (Doc. 127), the evidence submitted by the parties, (Docs. 110-1 through 110-57, Docs. 131-1 through 131-7), and the operative complaint, (Doc. 56), the Defendants' motion for summary judgment is granted.

## Introduction

Wean is an involuntarily committed resident of the Florida Civil Commitment Center (FCCC). Wean initiated this action by filing a civil rights complaint under 42 U.S.C. § 1983. (Doc. 1.) This matter is proceeding on Wean's Second Amended Complaint. (Doc. 56.) Wean sues Melinda Masters and Jon P. Carner, former facility directors of FCCC; Jarad Anderson, the current facility director; and Dr. Yen Le, the former medical director at FCCC.

(*Id.* at 3-4; Doc. 73.) Wean brings claims for deliberate indifference to his serious medical needs in violation of his Eighth and Fourteenth Amendment rights. (Doc. 56 at 6-7, ¶¶ 10-11.) Wean alleges that the Defendants have substituted their judgment for that of medical professionals by refusing to follow medical orders and recommendations. (*Id.* at 6 ¶10.) He seeks injunctive relief and money damages. (*Id.* at 19.)

**Factual Background**

Wean's weight has fluctuated between 350 and 507 pounds in recent years. (Doc. 110 at 1 ¶ 3; Doc. 127 at 1, ¶ 3.)[1] Wean reports medical problems including herniations in his back, a pinched nerve in his neck, hip pain, knee pain, shattered teeth, poor circulation that causes his arms to go numb overnight, continuous pain, and an ongoing compression fracture of his L1 disc. (Doc. 110 at 2 ¶¶ 4-6; Doc. 127 at 1 ¶ 4-6.) Wean attributes these problems to the Defendants' insistence that he sleep on uneven, crushed mattresses that do not support his weight. (*Id.*)

The earliest records submitted in this case date to 2021, when Wean made numerous sick call requests about pain in his back, knees, and hips, as well as numbness in his arms overnight, and asserted that these issues were due to sleeping on his mattress. (Docs. 110-8—110-16; Doc. 131-1, Exhibits 1-

[1] Wean states that he lost 40 pounds in the six months before he filed his response on July 31, 2026. (Doc. 127 at 8 ¶ 94.)

10.) Wean consistently ascribed these issues to sleeping on his mattress. (Doc. 110-10; Doc. 131-1, Ex. 4.) Medical staff advised Wean to stay active, lose weight, and adhere to a low-calorie and low-sodium diet. (Docs. 110-8, 110-9, 110-11.) On November 22, 2021, provider Mary Monsalud wrote Wean a pass for a "double mattress – 3 mo." (Doc. 110-16.)

One day earlier, on November 21, 2021, Wean had paid out of pocket for a mattress to be shipped to FCCC. (Doc. 56 at 8 ¶ 16.) But when the mattress was delivered on April 20, 2022, it was returned. (*Id.*) On April 28, 2022, Wean wrote to Defendant Masters, who was then the facility administrator, seeking direction on how to "get a mattress in that will support my weight and girth" and how to "get another mattress approved." (Doc. 110-18.) Masters responded on May 2, 2022, informing Wean that "FCCC will provide residents with all necessary items (including mattresses)," and advising him to "please address your mattress <u>needs</u> with health services staff." (*Id.*)

Two weeks later, on May 16, 2022, Nurse Practitioner Coleen Reilly saw Wean and approved a pass for a "wide double mattress." (Doc. 110-19.) The next day, NP Reilly added passes for "wide double bed" and "change out mattresses every 3 months." (*Id.*) She noted that Wean had requested a medical mattress. (*Id.*)

On June 21, 2022, NP Reilly approved a medical mattress for Wean, stating, "I am okay with this request as resident is morbidly obese." (Doc. 110-

21.) She filled out a treatment order stating that Wean "may have [a] medical mattress." (Doc. 110-21.) The order stated that the mattress must meet all facility standards and requirements, fit the current bed frame, be ordered through an approved vendor, and be approved by the Safety Director. (Doc. 110-21.)

On October 5, 2022, when Wean had not yet received the mattress he believed NP Reilly had approved for him, he asked Masters for an update. (Doc. 131-2, Ex. 76). Masters responded on October 7, 2022, that Wean was indeed ordered a medical mattress, which, she stated, "is a double mattress pass." (*Id.*) She also told Wean, "You already have a doublewide bed pass, change mattress every 3 months pass, doublewide mattress pass, and more." (*Id.*)

Several days later, on October 12, 2022, NP Reilly wrote Wean a pass for a "Wide –extra thick special mattress x 1 year." (Doc. 110-22.) That same day, Masters had FCCC staff make a 14-inch-thick mattress for Wean. (Doc. 56 at 7 ¶ 13.) On November 16, 2022, Wean asked NP Reilly for a pass for two egg crates to go on top of his mattress to address the numbness in his arms. (Doc. 110-24.) NP Reilly noted, "I am not sure this is safe as his current mattress was made by the facility and is 14 inches deep." (*Id.*)

Wean continued to report pain and numbness from sleeping on the facility mattress; he also reported that his pain medication was not providing

relief. (Doc. 131-1, Exs. 17-19.) Defendant Dr. Yen Le saw Wean on February 2, 2023, when he asked to see a back specialist who could order him a medical mattress. (Doc. 110-26.) Wean reported to Dr. Le that his chronic back pain was worsening, as his one-week-old double mattress had already compressed to 7 inches in the middle. (*Id.*) Dr. Le ordered physical therapy for back pain and back strengthening, and a lumbar spine X-ray. (*Id.*)

On February 8, 2023, Wean saw physical therapist Philline Mopas. He told Dr. Mopas that his mattress was uneven and crushed in the middle, causing him upper back pain and poor posture. (Doc. 110-28.) Dr. Mopas concluded that Wean "may benefit from a mattress whether medical or any kind that tolerate[s] his weight longer before thinning out in the middle area." (Doc. 110-28.)

On May 16, 2023, Dr. Le referred Wean to a pain specialist for chronic lower back pain, to orthopedics for low back pain, and to a clinic for orthotic shoe inserts. (Doc. 110-29.) Between May 19 and June 24, 2023, Wean submitted numerous sick call requests in which he stated that Dr. Le had decreased his tramadol dosage, requested that his prescriptions be renewed, and reported that he was still experiencing intolerable pain due to sleeping on an inadequate mattress. (Doc. 110-30; Doc. 110-32; Doc. 131-1, Exs. 28, 30, 32, 33.) When Dr. Le filled ordered baclofen and tramadol on June 26, 2023, Wean

wanted the order changed so that he could have tramadol three times per day. (Doc. 110-33; Doc. 131-1, Ex. 34.)

Wean had another appointment with Dr. Le on July 17, 2023. (Doc. 110-35.) Dr. Le wrote in her notes that they reviewed the results of Wean's lumbar spine CT scan, which included a moderate compression fracture of the L1 disc. (Docs. 110-34, 110-35.) Dr. Le approved a medical mattress for Wean "given the c/o pain and the finding of Lumbar CT back> ordere [sic] put in." (Doc. 110-35.) She also prescribed tramadol three times per day after discussing with Wean the benefits and risks of taking tramadol this often, including addiction. (Doc. 110-35.) This prescription was for one month. (*Id.*)

One month later, on August 17, 2023, Wean stated that his prescription for tramadol three times per day had not been renewed. (Doc. 131-1, Ex. 36.) The next day, Dr. Le prescribed tramadol three times per day. (Doc. 110-38.) On August 28, 2023, Dr. Le referred Wean to a neurologist. (Doc. 110-39.)

Several days later, on September 2, 2023, Wean returned to see Dr. Mopas, a physical therapist at FCCC. (Doc. 110-40.) Dr. Mopas noted that Wean had limited movement in his neck and that Wean "expressed that the neck pain might be from his sleeping posture." (*Id.*) Dr. Mopas wrote, "patient might benefit from a mattress which considers the weight as consideration [sic] of the size and thickness." (*Id.*)

On September 7, 2023, Wean was admitted to the FCCC infirmary "due to [the] need [for] a medical mattress." (Doc. 110-41.) He wrote a sick call request two days later, on September 9, 2023, stating that he was not provided a medical mattress in the infirmary. (Doc. 131-1, Ex. 38.) Wean reported that he was experiencing pain from the infirmary mattress because its center was less than one inch thick. (*Id.*)

Dr. Le met with Wean on September 12, 2023. (Doc. 110-45.) Her progress notes state that Wean reported the mattress in the infirmary helped with his neck mobility but was worn out and did not support his back. (*Id.*) Dr. Le also wrote that Wean reported that the tramadol was helping. (*Id.*)

Dr. Le's progress note summarized the advice she gave Wean during this visit. She reminded Wean that treating his pain was a multidisciplinary approach and that no mattress, or any other single treatment modality, could alleviate his pain. (*Id.*) Dr. Le stated that "[t]he term 'medical' here is used in the context of 'helps to alleviating [sic] pain if possible.' " (Doc. 110-45.) Dr. Le wrote that Wean needed a TENS machine, physical therapy, weight control, clinical support care, medical care, and pain medication to improve his pain levels, and that all these measures had been addressed. (*Id.*) Dr. Le wrote that referrals for Wean to see pain and orthopedic specialists had been placed, and that she had requested that the FCCC dietician regularly reevaluate

Wean. (*Id.*) When Wean asked to go back to his dorm two weeks later, on September 26, 2023, Dr. Le wrote, "I honor this request." (Doc. 110-46.)

Soon after moving out of the infirmary, on October 6, 2023, Wean wrote to Defendant Jon P. Carner, who was then the facility administrator, about the deficiencies in his mattress and the pain it caused him. (Doc. 131-2, Ex. 94.) He asked Carner to come to the dorm and look at the mattress. (*Id.*) Carner wrote in response, "We acknowledge your complaints and have made significant provisions for some time. Again, there is a multidisciplinary approach to progress. The mattress alone is not the solution. We are working on this, together." (*Id.*) Carner examined the mattress on October 12, 2023. (Doc. 56 at 14 ¶ 36.) Wean alleges that Carner told him he would never get a medical mattress because, if he did, many other residents would also ask for one. (*Id.*)

On December 6, 2023, Wean asked Carner to direct the workers who prepared his mattress to fill it with additional materials to compensate for the crushed middle. (Doc. 131-2, Ex. 96.) Carner responded, "Residents have no say in this. I have approved this fabrication/adjustment/additional padding in the middle of the mattress." (*Id.*) On December 8, 2023, Dr. Le made a second request that Wean be referred to a pain specialist, an orthopedist, and a neurologist. (Doc. 110-49.) Wean saw a neurologist, Dr. George G. Li, on December 12, 2023. (Doc. 110-50.) Dr. Li advised that Wean should "do hard

floor relaxation" and increase his medications for two weeks. (Doc. 110-50.) Dr. Li also wrote that Wean "needs to have a harder mattress to sleep on." (Doc. 110-50.)

## Legal Standards

### A. Liability Under Section 1983

Wean brings his Second Amended Complaint under 42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must allege that (1) the defendant deprived him of a right secured under the Constitution or federal law, and (2) the deprivation occurred under color of state law. *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (citing *Arrington v. Cobb Cnty.*, 139 F.3d 865, 872 (11th Cir. 1998)). In addition, a plaintiff must allege and establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation. *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1059 (11th Cir. 2001).

### B. Summary Judgment Standard

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden falls on the movant, who must identify evidence "which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To defeat summary judgment, the non-movant must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material facts exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006); *see also Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593–94 (11th Cir. 1995) (stating that the non-moving party may use "affidavits, . . . depositions, answers to interrogatories, and admissions on file" to identify specific facts showing that there is a genuine issue for trial (internal citations and quotation marks omitted)).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. Issues of fact are "genuine" only if a reasonable jury, considering the evidence presented, could find for the nonmoving party, and a fact is "material" if it may affect the outcome of the suit under governing law. *Id*. at 248–49.

In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. But a party cannot defeat summary judgment by relying on conclusory allegations. *Holifield v. Reno,* 115 F.3d 1555, 1564

n.6 (11th Cir. 1997). And "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.' " *Mize v. Jefferson Cnty. Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

"The court need consider only the cited materials" when resolving a motion for summary judgment. Fed. R. Civ. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted); *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) (stating that a court determining the relevant facts at summary judgment should draw all inferences in favor of the nonmovant only "*to the extent supportable by the record*" (emphasis added) (quotation omitted)).

**C. Law Applicable to Civilly Committed Residents**

Because Wean is civilly committed, the Due Process Clause of the Fourteenth Amendment applies to his claims. *Youngberg v. Romeo*, 457 U.S. 307, 319-20 (1982); *Dolihite v. Maughon*, 74 F.3d 1027, 1041 (11th Cir. 1996). Civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," and to whom the Cruel and Unusual Punishments Clause of the Eighth Amendment applies. *Romeo*, 457 U.S. at 321-22.

Accordingly, a person who is civilly committed retains certain substantive liberty interests under the Fourteenth Amendment, including the rights to adequate medical care and safe conditions. *Id.* at 315-16. But these liberty interests are not absolute, and not all restraints on them violate the committed person's rights. *Bilal v. Geo Care, LLC*, 981 F.3d 903, 912 (11th Cir. 2020). The State must exercise such restraints "in a way that is consistent with professional judgment about what is necessary." *Id.* at 907.

Under this "professional judgment" standard, a court must weigh the individual's liberty interest against relevant state interests. *Romeo*, 457 U.S. at 320-22; *Bilal*, 981 F.3d at 912. Security and rehabilitation are established state interests. *See Nealy v. Masters*, No. 24-13002, 2025 WL 3297835, at *2 (11th Cir. Nov. 26, 2025) (stating that the Eleventh Circuit has recognized that "the FCCC is a facility that is required under Florida law to be secure and serve a rehabilitative purpose" (quoting *Pesci v. Budz*, 730 F.3d 1291, 1299 (11th Cir. 2013))).

In considering the interests of the individual and the state, " 'the Constitution only requires that the courts make certain that professional judgment in fact was exercised' in the times and way the institution restrains the person's liberty." *Bilal*, 981 F.3d at 912 (quoting *Romeo*, 457 U.S. at 321). When a decision is made by a professional employed by a civil commitment center, that decision is "presumptively valid." *Bilal*, 981 F.3d at 912. A

professional in this context means any "person competent, whether by education, training or experience, to make the particular decision at issue." *Romeo*, 457 U.S. at 323 n.30.

If a court finds that sound professional judgment was exercised in the restriction of a civilly committed resident's liberty, the resident's claim will fail. "Liability attaches only when the decision represents 'such a substantial departure from accepted professional judgment, practice, or standards' that it shows that the employee did not, in fact, make the decision based on sound professional judgment." *Bilal*, 982 F.3d at 913 (quoting *Romeo*, 457 U.S. at 323). "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Romeo*, 457 U.S. at 321. Limiting a court's review through application of this professional judgment standard minimizes "interference by the federal judiciary with the internal operations of" state institutions. *Id.* at 322-23.

**Analysis**

The Defendants argue that the record refutes Wean's claims for deliberate indifference to his serious medical needs, and therefore that there are no genuine disputes of material fact concerning his claims for deliberate indifference to serious medical needs. The Court will address Wean's allegations against each of the Defendants.

### A. Defendant Masters

#### 1. Allegations of Deliberate Indifference

Masters worked at FCCC from November 2008 through April 2023. (Doc. 110-2 at 2 ¶ 2.) She was the assistant clinical director from April 2012 to August 2021, and served as the facility administrator from August 2021 through April 2023. (*Id.*) Wean alleges that Masters substituted her judgment for that of medical providers who concluded that he needed a medical mattress, and that Masters forced him to continue sleeping on "inferior" mattresses that caused or worsened his pain. (Doc. 56 at 10 ¶ 23.)

Wean first alleges that Masters refused to allow him to use the mattress he purchased at his own expense in November 2021. (*Id.* at 8-9 ¶¶ 16-18.) Next, Wean alleges that Masters overrode the "medical order/prescription" written by NP Reilly for a medical mattress and instead had FCCC staff make him a 14-inch-thick mattress that quickly became crushed. (*Id.* at 7 ¶ 12.) Finally, Wean alleges that Masters directed Dr. Le not to order him a medical mattress. (*Id.* at 10 ¶ 22.) Wean alleges that continuing to use the facility mattresses caused him excruciating pain, a compression fracture, and the loss of three molar teeth that were crushed in his sleep despite his protective mouth guards. (*Id.* at 7-8 ¶¶ 13-15.)

**2. Analysis**

To begin, the record shows that the involved parties have at times operated under different understandings of the term "medical mattress." As Masters told Wean, and as she stated in her affidavit, a medical mattress pass issued by the FCCC medical staff meant a pass for a double mattress—that is, two standard mattresses supplied by FCCC. (Doc. 110-2 at 4 ¶ 11; Doc. 110-21.) Masters further stated in her affidavit that only residents in the infirmary could use any other kind of mattress, but these infirmary mattresses were also sometimes referred to as medical mattresses. (Doc. 110-2 at 3-4, ¶¶ 7, 10-11.)[2]

Wean has not clarified what he understood the term "medical mattress" to mean during the events relevant to his claims. Wean has not stated whether he understood this term to refer to a specific model or type of mattress. To the extent that he may have understood the term to mean the same type of mattress that he purchased, or simply any mattress that would provide pain relief, he has not made this clear.

Regardless of any such differences, Masters is entitled to summary judgment on Wean's claim for deliberate indifference to his serious medical

[2] Difficulties with terminology are reflected in an email exchange between NP Reilly and Masters. Reilly told Masters that she informed Wean of the denial of his "bed request." (Doc. 131-7, Ex. 203.) Masters clarified to NP Reilly that a medical mattress would be a "double mattress or egg carton mattress at FCC" and expressed her understanding that one had been approved for Wean. (*Id.*, Ex. 204.) NP Reilly responded, "I approved a medical mattress. I thought that was what was being denied. I am so confused." (*Id.*, Ex. 205.)

needs. First, the record shows that Masters did not substitute her judgment for a medical provider's judgment when the mattress that Wean purchased and had delivered to FCCC was returned. Wean's communications to Masters show that he was aware by April 28, 2022, that he would not be permitted to use this mattress. (Doc. 110-18.)

Although Wean alleges that Masters approved the purchase on November 29, 2021, and that the ADA coordinator approved it on December 30, 2021, the record does not contain a specific order from a medical provider before April 28, 2022, authorizing Wean to use a "medical mattress." (Doc. 56 at 8 ¶ 16.) Masters states in her affidavit that when she was the facility administrator, mattresses were ordered from only one "distributor/supplier." (Doc. 110-2 at 3 ¶ 8.) In her answers to Wean's interrogatories, Masters stated that "[a]nother staff member mistakenly approved a mattress from an outside supplier, which was improper," and that the mattress was returned once "it was discovered by staff that an unauthorized mattress was delivered." (Doc. 110-6 at 4.)

The record also shows that Masters did not substitute her judgment for NP Reilly's judgment after NP Reilly approved a medical mattress on June 21, 2022. NP Reilly approved a medical mattress, which, as Masters clarified in communications to both NP Reilly and Wean, meant an FCCC double mattress. (Doc. 110-21; Doc. 131-2, Ex. 76; Doc. 131-7, Ex. 204.) Masters had

FCCC staff prepare a 14-inch-thick mattress intended to support Wean's weight. (Doc. 56 at 7 ¶ 13.) The mattress was scheduled to be replaced every three months. (Doc. 110-2 at 4 ¶¶ 12-13.)

Finally, Masters did not substitute her judgment for Dr. Le's by directing Dr. Le not to order a medical mattress. Wean does not identify when or under what circumstances Masters gave this direction to Dr. Le. In answering Wean's interrogatories, Dr. Le stated that she never denied Wean a mattress pass and was never ordered not to grant him one. (Doc. 110-5 at 4.) Wean has not presented evidence of a genuine issue of material fact regarding this aspect of his deliberate indifference claim.

Even if the record could be construed as showing that Masters substituted her judgment for that of medical staff, and taking the evidence in the light most favorable to Wean, summary judgment is still appropriate. As stated, the FCCC is required by law to be secure and offer rehabilitation. *See Nealy*, 2025 WL 3297835, at *2. And "the FCCC staff is 'best equipped to make difficult decisions regarding the administration of the facility in keeping with these obligations.' " *Id.* (quoting *Pesci*, 730 F.3d at 1299).

Masters was a professional whose decisions are presumptively valid. *See Bilal*, 981 F.3d at 912. She had worked at FCCC since 2008 and was the facility administrator in 2022, when the relevant events took place. Thus, she was competent, through training and experience, to make decisions about Wean's

complaints and to determine what kind of mattress he could use in the general population at FCCC. *See Romeo*, 457 U.S. at 323 n.30.

Masters's exercise of her professional judgment invoked the operations and security of FCCC. As stated in Masters's affidavit, as well as the affidavits of the next two successor facility administrators, FCCC provided mattresses to residents as a security measure to ensure compliance with fire safety and to prevent the introduction into FCCC of materials that could be used as weapons. (Doc. 110-1 at ¶¶ 6-9; Doc. 110-2 at ¶ 4-5; Doc. 110-3 at ¶¶ 4-5.)[3] This practice also accomplished the objective of avoiding the perception of favorable treatment for some residents. (*Id.*)

Masters exercised professional judgment when she had the FCCC staff prepare a double mattress for Wean. The mattress was intended to support Wean, and having the mattress made within FCCC complied with security measures and aligned with the need to avoid the appearance of favoritism among residents. Masters's decision was not "a substantial departure from accepted professional judgment, practice, or standards." *Bilal*, 982 F.3d at 913. Whether Masters's professional judgment should have prevailed over other

[3] Wean alleges that a response to his communications with the Department of Children and Families states that the Department had no policy prohibiting residents from "owning or purchasing medical mattresses." (Doc. 127 at 14.) Wean has not presented this response as evidence. But even if it had been presented, it would not have changed the outcome of Wean's claim because it fails to establish a genuine issue of material fact. For the reasons addressed, Masters exercised sound professional judgment in her decisions about Wean's mattress.

professionals' judgments is not a question before the Court. *See Romeo*, 457 U.S. at 323. Because a reasonable jury could not return a verdict for Wean finding that Masters was deliberately indifferent to his serious medical needs, Masters is entitled to summary judgment.

### B. Defendant Le

#### 1. Allegations of Deliberate Indifference

Dr. Le was the medical director at FCCC from April 7, 2022, through February 23, 2024. (Doc. 110-5 at 2.) Wean alleges that Dr. Le was deliberately indifferent to his serious medical needs by failing to treat his medical concerns properly and by forcing him to sleep on "inferior mattresses" that caused him pain and injury. (Doc. 56 at 10-11 ¶¶ 24, 27.)

Dr. Le put in an order for a "medical mattress" for Wean after reviewing his CT scan results on July 17, 2023. (Doc. 110-35.) Wean alleges that Dr. Le failed to order the mattress, a medically necessary item, earlier because she was following Masters's unlawful order not to do so. (Doc. 56 at 11 ¶¶ 25, 28.)

Wean also alleges that Dr. Le decreased his tramadol from three times a day to once a day "without even examining his back" because she believed Wean "could not take a narcotic for so long." (Doc. 56 at 11-12 ¶¶ 29-30.) Wean alleges that, despite his complaints of pain, Dr. Le did not adjust the tramadol dose back to three times daily on July 17, 2023, after reviewing the CT scan. (Doc. 56 at 12 ¶ 31.) Wean also alleges that Dr. Le intentionally let his pain

medications run out and refused to provide him with pain medication four times a day "as the medications called for." (Doc. 56 at 13-14 ¶ 35.)

Wean contends that Dr. Le did not inform him of his compression fracture, which was apparent from the CT scan, or treat him for it. (Doc. 56 at 12 ¶ 32.) Wean alleges that Dr. Le failed to ensure that his appointments with outside specialists were scheduled promptly. (*Id.* at 13 ¶ 33, 34.)

**2. Analysis**

Dr. Le is entitled to summary judgment on Wean's claim for deliberate indifference to his serious medical needs. First, as addressed, Dr. Le stated that she never denied Wean a mattress pass and was never ordered not to provide him with one. (Doc. 110-5 at 4.) And the record shows that Dr. Le exercised sound professional judgment in addressing Wean's concerns with his mattress. She ordered Wean a medical mattress pass on July 17, 2023, taking into account his complaints of pain and the results of his CT scan. (Doc. 110-35.) Making changes to Wean's mattress pass was one part of a comprehensive approach to improve his pain levels, which also involved components such as pain medication, dietary advice, and guidance, appointments with specialists, and physical therapy. (Doc. 110-45.)

Next, although Wean alleges that Dr. Le did not inform him of his compression fracture, Dr. Le's notes reflect that she discussed the CT scan with Wean on July 17, 2023. She states in her answers to Wean's interrogatories

that she explained to Wean on this date that he had a compression fracture. (Doc. 110-5 at 4; Doc. 110-35 at 4.) Wean has not come forward with evidence to show that any genuine issue of material fact exists on this part of his claim. *See Porter*, 461 F.3d at 1320.

Nor is there any genuine issue of material fact regarding Dr. Le's changes to Wean's tramadol prescription. Following the July 17, 2023, appointment, Dr. Le adjusted Wean's tramadol dosage to its previous frequency of three times a day. (Doc. 110-35.) Wean contends that Dr. Le should not have decreased this medication in the first instance and was deliberately indifferent in doing so.

But Wean agrees that Dr. Le initially decreased his tramadol out of concern about the length of time Wean had been taking it. (Doc. 56 at 11-12 ¶¶ 29-30.) After reviewing his CT scan results and discussing with Wean the risks of taking tramadol three times a day, including addiction, Dr. Le granted his request to change the dosage back to three times a day. (Doc. 110-35.) Dr. Le therefore exercised her professional judgment in managing Wean's medications based on factors including the potential for negative consequences of long-term use, her discussion with Wean about the benefits and risks of the medication, and Wean's reports of pain.

Wean also contends that Dr. Le intentionally allowed his medication to run out and refused to provide him with tramadol four times a day. He alleges

that he needed tramadol four times daily, or else he would be in "excruciating pain" from 2:30 a.m. to 8:00 a.m. (Doc. 56 at 13-14 ¶ 35.)

Dr. Le stated in her answers to Wean's interrogatories that she did not recall ever allowing Wean's medications to run out. (Doc. 110-5 at 3.) Dr. Victor De Loach, the current medical director at FCCC, reviewed Wean's medical chart and submitted an affidavit, in which he states that these records show no instance where Dr. Le "hindered or blocked" Wean from receiving pain medication. (Doc. 110-4 at 4 ¶ 14.) Wean has not come forward with evidence that any genuine issue of material fact exists on this part of his claim. *Porter v. Ray*, 461 F.3d at 1320. Wean also acknowledges that FCCC staff only distribute medications three times a day. (Doc. 127 at 4 ¶ 71.) Moreover, Dr. Le exercised sound professional judgment in determining the dosage of tramadol she prescribed for Wean.

Finally, while Wean alleges that Dr. Le failed to ensure the timeliness of his appointments without outside medical specialists, any delays are not attributable to her. De Loach stated in his affidavit that the FCCC medical director "does not make the actual outside appointment for the Resident." (Doc. 110-4 at 4 ¶ 13.) The extent of the medical director's involvement in scheduling outside services is placing an order for the resident to be seen. (*Id.*) After that point, "other FCCC staff" work to schedule the appointment, which depends on numerous factors, including the outside specialist's availability,

the emergent nature of the condition, and transportation arrangements. (*Id.*) Wean has not produced evidence that any genuine issue of material fact exists on this aspect of his claim. *See Porter*, 461 F.3d at 1320.

The record shows that Dr. Le exercised sound professional judgment in providing medical care for Wean. Because a reasonable jury could not return a verdict for Wean on his claim that Dr. Le was deliberately indifferent to his serious medical needs, Dr. Le is entitled to summary judgment.

### C. Defendant Carner

#### 1. Allegations of Deliberate Indifference

Wean alleges that Carner violated his constitutional rights by "substituting his opinion" over those of NP Reilly, Dr. Le, Dr. Mopas, and Dr. George Li regarding the kind of mattress that he needed. (Doc. 56 at 14 ¶ 36.)

Dr. Mopas, a physical therapist, saw Wean twice in 2023. Dr. Mopas wrote that Wean might benefit from sleeping on a mattress chosen for the purpose of offering more support. (Docs. 110-28 and 110-40.) After examining Wean on December 11, 2023, Dr. George Li, a neurologist, found that Wean "needs to have a harder mattress to sleep on." (Doc. 110-50.) Wean alleges that Carner substituted his judgment for the opinions of Drs. Mopas and Li when, on October 12, 2023, he told Wean that he would never get a medical mattress. (Doc. 56 at 14 ¶ 36.)

**2. Analysis**

Carner is entitled to summary judgment. The record shows that Carner did not substitute his judgment for that of Dr. Mopas or Dr. George Li as alleged. Wean did not see Dr. Li until December 2023, after Wean alleges that, in October 2023, Carner told him he would never receive a medical mattress. (Doc. 110-50.) Furthermore, Dr. Mopas generally recommended that Wean might benefit from a mattress that provided more support for his weight. (Doc. 110-28 and 110-40.) The record shows that Carner did attempt to provide a supportive mattress for Wean. While Carner was the facility administrator, FCCC staff prepared double mattresses for Wean in an effort to support his weight. (Doc. 110-1 at 3 ¶ 12.) Although Wean disputes Carner's statements that the staff also used an egg crate and extra memory foam, he agrees that he received double mattresses. (Doc. 127 at 7 ¶ 88.)

Furthermore, even if Carner substituted his judgment for that of any provider, he did so while exercising professional judgment. Carner worked at FCCC from February 10, 2019, through March 2024. (Doc. 110-1 at 1 ¶¶ 2-4.) Carner held positions as director of security, assistant facility administrator, and facility administrator. (*Id.*) Because this experience qualified Carner to make decisions about management and security at FCCC, he acted as a professional for purposes of the applicable standard of review. *See Romeo*, 457 U.S. at 323 n.30.

The record shows that Carner attempted to provide Wean with a mattress that could help alleviate his pain and encouraged Wean to work with the staff on other aspects of this treatment. (Doc. 110-1 at 3 ¶ 12; Doc. 131-2 Exs. 91, 92, 94.) Carner's decisions were also guided by security measures at FCCC, such as fire regulations and the need to prevent the introduction of materials that could be used as weapons. (Doc. 110-1 at 3 ¶ 7.) He also considered the need to avoid giving other residents a perception of favoritism or special treatment if Wean had a different type of mattress. (*Id.* ¶ 8.)

Thus, Carner used sound professional judgment in addressing Wean's concerns about his mattress. And even if Carner's judgment was inconsistent with the providers' judgment, the Court cannot determine which judgment should have prevailed. *See Romeo*, 457 U.S. at 321. A reasonable jury could not return a verdict for Wean on the claim that Carner was deliberately indifferent to his serious medical needs. Consequently, Carner is entitled to summary judgment.

**D. Defendant Jarad Anderson**

Anderson was added as a party to this lawsuit on March 11, 2025, when he took over the role of FCCC facility administrator. Doc. 71. This substitution was procedural, *see* Fed. R. Civ. P. 25(d), and Wean's Second Amended

Complaint does not bring any claims against Anderson. Anderson is therefore entitled to summary judgment.[4]

**E. All Defendants**

Wean alleges that the Defendants retaliated against him for filing this lawsuit by forcing him to move cells three times in six days, which resulted in a back injury. (Doc. 56 at 14-15 ¶¶ 37, 38.) He contends that the Defendants violated his constitutional rights. (*Id.*) But Wean does not explain how any of the Defendants are responsible for this alleged violation. (*Id.*) A conclusory allegation involves no genuine issue of material fact and, therefore, cannot proceed past summary judgment. *See Butler v. Coca-Cola Co.*, No. 1:19-cv-03847-AT-AJB, 2021 WL 11707646, at *19 (N.D. Ga. Aug. 3, 2021), report and recommendation adopted, 2021 WL 11707651 (N.D. Ga. Aug. 25, 2021) (stating that a vague and conclusory allegation of retaliation "is the very definition of the 'scintilla of evidence' which does not survive summary judgment" (quoting *Anderson*, 477 U.S. at 252)).

[4] Anderson states in his affidavit that FCCC has ordered a special mattress designed to accommodate Wean's weight. (Doc. 110-3 at 4 ¶ 13.) Because all residents in the general population must use the same kind of mattress, Wean would have to move to the infirmary to use the new mattress. (*Id.* ¶ 14.) Anderson states that Wean has declined to move to the infirmary. (*Id.* ¶ 4.) Wean disputes this point, alleging that he has been willing to move to the infirmary and is willing to do so "right now." (Doc. 12 at 8 ¶ 93.) But Wean alleges that the "sticking point" is that FCCC personnel are unwilling to make a move to the infirmary permanent. (*Id.* ¶ 92.)

Accordingly, the Defendants' motion for summary judgment, (Doc. 110), is **GRANTED**. The **CLERK** is directed to enter judgment in the Defendants' favor, to terminate any pending motions and deadlines, and to **CLOSE** this case.

**DONE AND ORDERED** in Fort Myers, Florida, on September 23, 2026.

Sheri Polster Chappell
**SHERI POLSTER CHAPPELL**
**UNITED STATES DISTRICT JUDGE**

Copies: All Parties of Record